DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | |
| v. | ) ) | Criminal Action No. 2014-0056 |
| **LUKE LUBRIN,** | ) ) ) | |
| **Defendant.** | ) ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Eric S. Chancellor, Esq.,**
St. Croix, U.S.V.I.
    *For the Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER is before the Court on Defendant Luke Lubrin's "Motion to Suppress Evidence." (Dkt. No. 8; 14-cr-0050, Dkt. No. 17). The Government opposes Defendant's Motion. (14-cr-0050, Dkt. No. 20).[1] For the following reasons, the Court will deny Defendant's Motion.

### I. BACKGROUND AND EVIDENCE

Defendant Luke Lubrin has been indicted on one count of the manufacture of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D). (Dkt. No. 1). In the instant Motion, Lubrin

---

[1] The Motion to Suppress and the Opposition were filed in case number 14-cr-0050, which was initiated by Information. Upon motion of the Government, that case was dismissed following the filing of an Indictment, which initiated the instant matter—case number 14-cr-0056. Unless otherwise indicated, citations are to 14-cr-0056.

seeks to suppress all evidence seized from his property on June 26, 2014 as the fruits of a warrantless search of his home and curtilage in violation of his Fourth Amendment rights. At the suppression hearing, Drug Enforcement Administration ("DEA") Special Agent Brian Gaumond ("Agent Gaumond"), DEA Resident Agent Wes Fritz ("Agent Fritz"), and Lubrin testified. The following facts emerge from the record established at the hearing. (14-cr-0050, Dkt. No. 33 (transcript of hearing)).[2]

A.  **Defendant Lubrin's Property in Estate Two Friends**

In June 2014, DEA agents from the St. Croix High Intensity Drug Trafficking Areas ("HIDTA") program executed a search warrant at a residence located in Estate Stoney Ground in Frederiksted, Virgin Islands. (14-cr-0050, Dkt No. 33 at 5-6). There, they seized marijuana, equipment used to cultivate marijuana, and documents. (*Id.* at 6). The documents revealed that the home was being used by Ronald and Okimo Milligan. (*Id.* at 7). Although it appeared to the agents that the property was being used to cultivate marijuana, only a small amount of marijuana was found. (*Id.* at 6-7). The agents learned that Ronald Milligan owned another property located at 10-F Estate Two Friends, and believed that the Milligans had moved a marijuana cultivation operation to this property. (*Id.* at 8, 11, 106).

On June 26, 2014, four HIDTA agents traveled to Estate Two Friends in an attempt to locate Milligan. (*Id.* at 8, 10-11). While surveying Estate Two Friends by car for Lot 10-F, the DEA agents observed undeveloped land, farmland, and a few lots with structures or residences. (*Id.* at 11-12, 106-07). However, none of the parcels were labeled or numbered. (*Id.*).

---

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Lubrin is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

As it was later determined, Defendant Lubrin owns Lot 10-A of Estate Two Friends and resides on the property in a yellow house with a green front door. (*Id.* at 69, 78). Lubrin farms various fruit trees and crops on Lot 10-A, and stores tools in a shed near his house. (*Id.* at 98, 145). As also later determined, Lot 10-A is adjacent to Lot 10-B, which is owned by Raymond Mathurin. (*Id.* at 69). Mathurin does not permanently reside on Lot 10-B and is constructing a foundation for a house on the property. (*Id.* at 86). He occasionally stays in a separate small structure on Lot 10-B. (*Id.*).

Both lots are rectangular and share an overlapping side, with each lot fronted by a public road on one side. (*See* Gov. Ex. 3, aerial photograph). There is no obvious internal division between the two properties. (14-cr-0050, Dkt. No. 33 at 28, 119).[3] Lubrin's property is lined on two sides by a barbed wire fence ending at a lamp post on the corner of Lots 10-A and 10-B. (*Id.* at 12). Mathurin built an identical barbed wire fence extending from the lamp post along one side of his property. (*Id.* at 154).[4] There is a partial "No Trespassing" sign on the fence on a front corner of Lubrin's property along the public road. (*Id.* at 76, 154, 175).

Lubrin's property may be accessed from the public road. (*Id.* at 12). This entrance consists of a wooden frame and gate; hinges made from tire rubber; a nail holding the gate closed; and a small wood latch that allows the gate to swing open. (*Id.* at 22, 108). There is direct access through trees and brush to the front door of the yellow house, although no defined or constructed path exists. (*Id.* at 46, 80, 111, 131). As to Mathurin's property, there is a partial

---

[3] At the suppression hearing, Lubrin first testified that a row of coconut trees serves as a visible dividing line, (14-cr-0050, Dkt. No. 33 at 154-55), but later acknowledged that coconut trees grow on both lots and that the lots appear to be one yard, (*id.* at 170).

[4] Lubrin acknowledged at the suppression hearing that the two fences look like one continuous fence. (14-cr-0050, Dkt. No. 33 at 169).

fence within the brush along the public road fronting Lot 10-B. (*Id.* at 13). There is no gate; a break in the fence allows entry onto Mathurin's property. (*Id.* at 13, 40).

**B.      The Agents' Entry Onto and Observations Within Defendant Lubrin's Property**

According to Agent Gaumond and Agent Fritz, the four HIDTA agents stopped at the wooden gate to Lubrin's property and did not see any signs or numbering on the gate. (*Id.* at 22). They walked two sides of the property's perimeter along the barbed wire fence. (*Id.* at 12). From the public road, the agents observed water barrels, black pots, Styrofoam cups, and Pro-Mix potting soil on the property. (*Id.* at 12, 107). Based on their knowledge—as a result of their professional experience—that such items are commonly used in marijuana cultivation, the agents believed that the property might belong to Milligan. (*Id.* at 23, 107).

Agent Gaumond and Agent Fritz returned to the wooden gate, while DEA Special Agent Daniel DeFranzo ("Agent DeFranzo") and Task Force Officer Donnell Samuel ("Officer Samuel") continued to walk the perimeter of Lots 10-A and 10-B. (*Id.* at 25). From outside the gate, Agent Gaumond and Agent Fritz observed the yellow house with a green door approximately twenty to thirty yards away. (*Id.* at 25, 207). Agent Fritz called from the gate but no one responded. (*Id.* at 107). He then moved the gate's latch and the two agents entered the property with the intention of approaching the yellow house, knocking on the door, and inquiring about Milligan. (*Id.* at 23, 79, 108).

The agents testified that they walked directly to the front door. (*Id.* at 80, 108, 111). The agents were a few feet apart, with Agent Gaumond on the right and Agent Fritz on the left. (*Id.* at 79, 133). As the agents approached the yellow house, they heard a radio or television playing inside and observed a shed to the right side, as well as a small structure behind the yellow house. (*Id.* at 24-26, 109). When Agent Fritz was approximately two feet from the front door, he

observed five marijuana plants in black pots, located approximately seven to eight feet away, on the left side of the yellow house but toward the front corner. (*Id.* at 108, 113).

Agent Gaumond testified that he knocked on the door of the yellow house, but received no answer. (*Id.* at 26).[5] From in front of the house, Agent Gaumond observed a man, later identified as Mathurin, rising from the steps of the small structure located behind and to the right of the yellow house. (*Id.* at 25-26). Mathurin went inside the structure and returned outside carrying a pick-axe. (*Id.* at 26). Agent Gaumond called and waved to Mathurin, beckoning him with the intention of determining who he was and if he knew whether Milligan lived on the property. (*Id.* at 26-27).

**C.     The Agents' Encounter With Mathurin**

Mathurin walked over to the agents and met them in front of the yellow house. (*Id.* at 28, 109). The agents asked Mathurin who he was and about the property. (*Id.* at 39, 109). Mathurin stated that he lived on the property with a friend and indicated that he, Mathurin, stayed in the second structure. (*Id.* at 29-30, 109). When asked if he could get into the yellow house, Mathurin proceeded to the front door and unsuccessfully tried to open the door, which was locked. (*Id.* at 30, 109). Mathurin then stated that he did not have a key and that Lubrin, his friend, resided in the house. (*Id.* at 30, 109-10).

At the request of Agent Gaumond and Agent Fritz, Mathurin retrieved identification from the second structure. (*Id.* at 31-32, 114-15). The agents told Mathurin that they had found marijuana plants outside the yellow house and smelled marijuana near Mathurin's structure, and asked if he would consent to a search of the property for additional marijuana. (*Id.* at 32, 115).

---

[5] Agent Fritz testified that he did not remember Agent Gaumond knocking on Lubrin's front door. (14-cr-0050, Dkt. No. 33 at 135). However, whether Agent Gaumond actually knocked on Lubrin's front door does not affect the Court's ruling.

5

Mathurin verbally consented. (*Id.*). Agent Gaumond and Agent Fritz conveyed Mathurin's consent to Agent DeFranzo and Officer Samuel, who subsequently began searching an area that included what was later learned to be Lubrin's Lot 10-A. (*Id.* at 34, 116).

Mathurin led Agent Gaumond and Agent Fritz up a hill, away from Lubrin's house and Mathurin's structure, to a clearing where the foundation of Mathurin's unbuilt house lay. (*Id.* at 33, 116). Mathurin revealed several marijuana plants under plywood within the foundation. (*Id.*). During this time, the other agents alerted Agent Gaumond and Agent Fritz that they had located approximately fifty marijuana plants on what was later determined to be Lubrin's property. (*Id.* at 34, 116). When Agent Gaumond and Agent Fritz relayed this information to Mathurin, he stated the plants did not belong to him and were Lubrin's. (*Id.* at 35, 118). According to Agent Gaumond and Agent Fritz, Mathurin did not indicate that the location where the plants had been found was in fact Lubrin's property or that there was any separation of lots. (*Id.*). When the agents responded that Mathurin could be charged for the full amount of plants discovered, Mathurin telephoned Lubrin and told him to come to the property to take responsibility for his plants. (*Id.* at 35-36, 118). After waiting some time for Lubrin, the agents arrested Mathurin, seized the marijuana plants discovered thus far, and began to return to the local HIDTA office. (*Id.* at 36-37, 118).

### D. The Agents' Encounter With Defendant Lubrin

On their way to the HIDTA office, the agents observed a man walking on the side of the road leading to Estate Two Friends. (*Id.* at 38, 122). The agents stopped, confirmed that the man was Luke Lubrin, told him they had found marijuana on the property, and arrested him. (*Id.*). Agent Gaumond advised Lubrin of his rights, and Lubrin stated he understood them and wanted to cooperate. (*Id.* at 38-39, 123). He told the agents that he had additional plants in his house and signed a consent-to-search form. (*Id.* at 38-39, 124).

6

Lubrin led the agents to his property via a path originating from the public road and crossing through Mathurin's property. (*Id.* at 39-40, 124-25). Lubrin opened the front door of the yellow house and showed the marijuana inside to the agents. (*Id.* at 41, 125). He also offered that he had additional marijuana in his shed and indicated its location to the agents. (*Id.*). The agents seized the marijuana from Lubrin's yellow house and shed. (*Id.* at 41).

## II.   DISCUSSION

Asserting violations of his Fourth Amendment rights, Lubrin seeks to suppress: (1) approximately five marijuana plants first observed by Agent Fritz next to Lubrin's yellow house as a result of the agents' entry onto Lubrin's property; (2) approximately fifty marijuana plants discovered on Lubrin's property by Agent DeFranzo and Officer Samuel following Mathurin's consent to search; and (3) marijuana plants and dried marijuana found in Lubrin's yellow house and tool shed as a result of Lubrin's consent to search.

### A.   "Knock and Talk" Doctrine

Lubrin argued at the suppression hearing that the agents' warrantless entry into his home's curtilage was not justified by the so-called "knock and talk" doctrine because the agents (1) entered with the impermissible purpose of searching the property for marijuana and (2) transgressed beyond the permissible scope of a "knock and talk." The Court disagrees and finds that the agents' conduct is consistent with the requirements of a "knock and talk" encounter.

#### 1.   Applicable Legal Standards

The Fourth Amendment protects individuals from "unreasonable searches" in their homes. U.S. CONST. amend. IV. A search occurs when the government (1) physically intrudes on constitutionally protected areas or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013); *Kyllo v.*

7

*United States*, 533 U.S. 27, 33 (2001). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation omitted). Courts "regard the area 'immediately surrounding and associated with the home'—what [] cases call curtilage—as part of the home itself for Fourth Amendment purposes." *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)); *accord Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property.").

"[I]t is not a Fourth Amendment search [for a government officer] to approach the home in order to speak with the occupant." *Jardines*, 133 S. Ct. at 1416 n.4. This is based on the premise that society has traditionally granted visitors an implied license to enter a property to reach the front door of a home. *See id.* at 1415 (citing *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). Thus, it is reasonable conduct—and not an unreasonable "Fourth Amendment search"—when a police officer enters private property but remains within the scope of what society permits any private citizen to do on another person's curtilage. *See id.* at 1415-16 ("[A] police officer not armed with a warrant may approach a home and knock, *precisely because* that is 'no more than any private citizen might do.'") (emphasis added) (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)); *Marasco*, 318 F.3d at 519 (a police officer may "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants *just as any private citizen may*") (emphasis added).

These principles are embodied in the "knock and talk" doctrine, according to which a law enforcement officer lacking a warrant may enter private property, proceed to the front door, and attempt to speak to the occupants about an investigation, without offending the Fourth

Amendment. *Marasco,* 318 F.3d at 519 (noting that officers are entitled to use the "knock and talk" strategy); *see United States v. Butler*, 405 F. App'x 652, 656 (3d Cir. 2010) ("[C]onsistent with the Fourth Amendment, police may employ the so-called 'knock and talk' technique as a tool to investigate criminal activity."). The Third Circuit has identified three requirements for a permissible "knock and talk": (1) a government officer "must knock promptly, wait briefly to be received, and then, (absent invitation to linger longer) leave"; (2) the purpose of the entry and any encounter "must be to interview the occupants of a home, not to conduct a search"; and (3) "a 'knock and talk' encounter must begin at the front door . . . where police officers, like any other visitors, have an implied invitation to go." *Carman v. Carroll*, 749 F.3d 192, 198 (3d Cir.) (internal citation and quotation omitted), *rev'd on other grounds*, 135 S. Ct. 348 (Nov. 10, 2014) (per curiam).

Ultimately, for an officer to avail himself of the "knock and talk" justification, both his initial entry onto the property and his conduct within the property must be reasonable; that is, they must not objectively indicate that the officer's purpose was to initiate a warrantless search instead of engaging the inhabitants. *See Jardines*, 133 S. Ct. at 1417 (an officer's entry into curtilage with a drug-sniffing canine violated the Fourth Amendment because his "behavior objectively reveal[ed] a purpose to conduct a search"); *Carman*, 749 F.3d at 198-99 (recognizing that "an officer's entry into other parts of the curtilage 'after not receiving an answer at the front door might be reasonable'" in limited, fact-specific circumstances) (quoting *Marasco*, 318 F.3d at 520); *United States v. Coles*, 437 F.3d 361, 370 (3d Cir. 2006) ("knock and talk" doctrine did not apply where officers' conduct of misleading occupants into believing they were not police officers to gain entry into apartment "demonstrated that the police had no intention of merely investigating matters further or perhaps obtaining consent to search").

9

**2.     Analysis**

Lubrin first asserts that the agents' "casing" of the perimeter of Lots 10-A and 10-B indicates that they impermissibly entered Lubrin's property with an intent to search, rather than to speak with an inhabitant, and thus cannot invoke the "knock and talk" doctrine. The Court disagrees.

As a preliminary matter, the context of this case is important. The undisputed testimony revealed that the agents were attempting to find Milligan, the record owner of a plot of land located in an area where the parcels of land were not labeled or numbered. (14-cr-0050, Dkt No. 33 at 8, 10-12, 106-07). In this context, what Lubrin characterizes as "casing" the perimeter of Lots 10-A and 10-B, reflecting an intent to search, is reasonably and objectively understood as a legitimate means of identifying the property that Milligan was believed to own, and of locating Milligan with whom the agents desired to speak.

Moreover, the agents' conduct of observing a property's curtilage from the public road does not, alone, implicate the Fourth Amendment. *See California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."); *United States v. Chun Yen Chiu*, 857 F. Supp. 353, 359 (D.N.J. 1993) ("As a general rule, it is not unlawful for officers outside the curtilage to observe what occurs thereon.").[6] The sight of indications of marijuana cultivation, such as pots, barrels, and potting soil, provided the basis for the agents to conclude that the unmarked property could belong to Milligan. (*See* 14-cr-0050, Dkt. No. 33 at 23, 107). Therefore, consistent with the agents' testimony that they entered the property to approach the house and speak to an inhabitant, (*id.* at 23, 79, 108), Agents Gaumond

---

[6] The parties do not dispute that the area within Lubrin's fence constitutes curtilage of his home, or that the DEA agents ultimately entered the curtilage without a warrant.

10

and Fritz could reasonably enter the property for purposes of a "knock and talk" to determine the property's ownership and inquire about their investigation. *Carman*, 749 F.3d at 198 (the permissible purpose of the "knock and talk" is to interview the occupants of a home).

The fact that the agents believed that Milligan had moved a marijuana cultivation operation to the property, together with their observations of indications of marijuana cultivation on the property in question, would not necessarily—and does not here—transform the agents' approach to the front door into a Fourth Amendment violation. Indeed, the law permits a "knock and talk" entry for the purpose of obtaining information from an occupant necessary to secure a search warrant or for the purpose of seeking consent to search. *See Coles*, 437 F.3d at 370 (observing that a permissible purpose for a "knock and talk" is to obtain consent to search); *United States v. Claus*, 458 F. App'x 184, 188 (3rd Cir. 2012) ("[T]he recognized purposes behind the 'knock and talk' procedure is to either speak with occupants or ask for consent to search."); *Butler*, 405 F. App'x at 656 (describing "knock and talk" as an "investigatory technique" used by law enforcement officers "to obtain information from an occupant that might enable police to make the requisite evidentiary showing needed to secure a warrant"). Here, the objective reasonableness of Agent Gaumond's and Agent Fritz's entry onto the property—supported by the objective reasonableness of their conduct within Lubrin's curtilage as discussed below—placed their conduct squarely within the scope of the "knock and talk" doctrine. *See Jardines*, 133 S. Ct. at 1416 n.4 ("The mere purpose of discovering information . . . in the course of engaging in [the] permitted conduct [of approaching the home in order to speak with the occupant] does not cause it to violate the Fourth Amendment.").

Lubrin next argues that Agent Gaumond's and Agent Fritz's entry beyond the latched wooden gate was impermissible under the "knock and talk" doctrine. This argument also lacks merit.

Agent Gaumond and Agent Fritz were permitted to enter through Lubrin's unlocked front gate when approaching his front door because such conduct is within the implied invitation granted to any visitor. *See Carman*, 749 F.3d at 198. Agents Gaumond and Fritz testified that the gate was unlocked and there were no signs near the gate barring entry. (14-cr-0050, Dkt. No. 33 at 22, 107).[7] Lubrin confirmed Agent Fritz's testimony that the gate was easily opened. (*Id.* at 22, 176). Under these circumstances, the agents' act of opening a latched gate to access Lubrin's front door "did not trigger Fourth Amendment concerns associated with warrantless, nonconsensual entries onto curtilage." *Claus*, 458 F. App'x at 188 (upholding police officers' opening of and entry through a closed chain-link gate to reach front porch for a "knock and talk"); *see United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012) ("[A] police entry through an unlocked gate on a driveway to approach the front door of a residence for a 'knock-and-talk' is a reasonable, limited intrusion for legitimate law enforcement objectives."); *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (holding that officers did not violate Fourth Amendment by passing through closed, unlocked gate and approaching house in order to conduct "knock and talk" with resident of house). Thus, the entry onto Lubrin's property by Agents Gaumond and Fritz was legally permissible.

---

[7] Agent Gaumond acknowledged that there was a partial "No Trespassing" sign located on the corner of Lubrin's property. (14-cr-0050, Dkt. No. 33 at 70-71, 76). Agent Gaumond testified, and Lubrin confirmed, that there were no signs near the front gate. (*Id.* at 71, 76, 175-76).

Lubrin further argues that Agent Fritz deviated from the path to Lubrin's front door, thereby indicating an intent to search the property and exceeding the scope of a "knock and talk." The Court is not persuaded.

Testimony at the suppression hearing indicates that Agent Fritz's approach to Lubrin's front door was reasonable. Agent Fritz testified that he walked directly to the front door—a few feet to the left of Agent Gaumond—and observed marijuana plants on the side of the yellow house, but near its front corner. (14-cr-0050, Dkt. No. 33 at 108, 133). Even assuming, as Lubrin testified, that a person directly approaching his front door from the wooden gate would have to be walking two or three steps off his route to the door to see the side of his house where Agent Fritz observed the plants, (*id.* at 151-52), the Court does not consider this to be a detour or deviation of any significance from the direct path so as to vitiate the applicability of the "knock and talk" doctrine. This is especially so where, as here, there were two agents walking side-by-side, so as to make it credible and reasonable that Agent Fritz was properly on the path that he took.[8]

In short, the Court rejects the contention that the applicability of the "knock and talk" doctrine should be relegated to measurements of two or three steps from an alleged path. Such a miniscule deviation—if it can be considered a deviation at all—fails to rise to the level of actions reflective of an intent to search, and does not extend beyond the license traditionally afforded to citizens in approaching a residence. *See Carman*, 749 F.3d at 198 ("'Complying with the terms of that traditional invitation [for visitors to approach a front door] does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.'") (quoting *Jardines*, 133 S. Ct. at 1415). Accordingly, the Court finds that Agent

---

[8] The apparent absence of a clearly defined walkway provides further support for this conclusion. (*See* 14-cr-0050, Dkt. No. 33 at 80, 131).

13

Fritz did not impermissibly deviate from the permitted approach for a "knock and talk." Moreover, because Agent Fritz was within the proper scope of a "knock and talk" when he viewed the five marijuana plants, his observations were permissible and do not implicate the Fourth Amendment. *Horton v. California*, 496 U.S. 128, 134 n.5 (1990) (a law enforcement officer's "mere observation" of objects left in plain view does not implicate the Fourth Amendment); *Ciraolo*, 476 U.S. at 213 (same); *Marasco*, 318 F.3d at 519 ("Knock and talk investigations normally do not raise Fourth Amendment concerns . . . because 'when the police come onto private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (*e.g.*, walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.'") (quoting LAFAVE, 1 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f) (2d ed. 2003)); *see also United States v. Cox*, 391 F. App'x 756, 758 (11th Cir. 2010) (agents' plain view observations of marijuana plants in trays, made while "directly on [] route" to defendant's cabin door for a "knock and talk," did not violate defendant's Fourth Amendment rights).

Finally, Lubrin argues that the agents were not justified by the "knock and talk" doctrine when they engaged Mathurin in front of Lubrin's yellow house and ventured further into Lubrin's curtilage during their conversation with Mathurin. Once again, the Court disagrees.

Here, the agents' actions in engaging Mathurin were reasonable. Agent Gaumond, Agent Fritz, and Lubrin himself testified that Lubrin and Mathurin's properties—which at the time the agents suspected of belonging to Milligan—appeared to be one lot. (14-cr-0050, Dkt. No. 33 at 28, 119, 170). Testimony at the suppression hearing further indicated that Agent Gaumond saw Mathurin from in front of Lubrin's front door and immediately beckoned Mathurin. (*See id.* at

26, 108-09, 135). Having observed Mathurin, it was reasonable for Agent Gaumond to interact with him in an attempt to effectuate the "knock and talk" investigation.[9] The legitimacy of the agents' conduct is not undercut by their attempt to achieve the very purpose of a "knock and talk" by engaging an individual encountered on the property, and based on that encounter, by pursuing further legitimate inquiries.[10] Accordingly, the Court finds no Fourth Amendment violation as to the conduct of Agent Fritz and Agent Gaumond in engaging with Mathurin.

## B.  Third Party Consent to Search

Lubrin argues that Agent Fritz and Agent Gaumond unreasonably believed that Mathurin had the authority to consent to a search of an area encompassing Lot 10-A, and therefore marijuana plants found within Lubrin's curtilage pursuant to that consent must be excluded. The Court rejects Lubrin's argument in this regard.

### 1.  Applicable Law

A search pursuant to valid consent is "reasonable" under the Fourth Amendment and therefore neither a warrant nor probable cause is required. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973) (citing *David v. United States*, 328 U.S. 582, 593 (1946)); *United States v.*

---

[9] The Court recognizes that the Third Circuit has stated that in a "knock and talk," a government officer "must knock promptly, wait briefly to be received, and then, (absent invitation to linger longer) leave." *Carman*, 749 F.3d at 198. However, the Third Circuit has acknowledged that nonconformity with the three "knock and talk" requirements may be permitted if the officers' conduct is reasonable. *See id.* at 198-99 (repeating that "an officer's entry into other parts of the curtilage 'after not receiving an answer at the front door might be reasonable'" in certain circumstances) (quoting *Marasco*, 318 F.3d at 520). Here, the Court concludes that, to the extent the agents' interaction with Mathurin can be deemed to deviate from the specific requirements of a "knock and talk" enunciated by the Third Circuit, such deviation was reasonable

[10] This case does not present a situation of the type that would fall within the "'sweeping proposition'"—rejected by the Third Circuit—that "'officers may proceed to the back of a home when they do not receive an answer at the front door *any time* they have a legitimate purpose for approaching the house in the first place.'" *Carman*, 749 F.3d at 199 (quoting *Marasco*, 318 F.3d at 520) (emphasis added). Instead, the facts indicate that, under the circumstances here, Agents Fritz and Agent Gaumond's conduct in communicating with Mathurin was eminently reasonable.

*Stabile*, 633 F.3d 219, 230 (3d Cir. 2011). Consent must be voluntarily and freely given. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). In addition, the person giving consent must possess the authority to do so. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

The Fourth Amendment does not guarantee that "no government search of [an individual's] house will occur unless he consents"; it assures that "no such search will occur that is 'unreasonable.'" *Id.* at 186. Accordingly, "the consent of one who possesses common authority over premises . . . is valid against the absent, nonconsenting person with whom that authority is shared." *Stabile*, 633 F.3d at 230 (quoting *United States v. Matlock,* 415 U.S. 164, 170 (1974)). Common authority

> rests not on property rights but "rather on mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Id.* at 230-31 (quoting *Matlock,* 415 U.S. at 171 n.7).

The Third Circuit has recognized the apparent authority doctrine, which excuses "otherwise impermissible searches where officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." *United States v. Walker,* 529 F. App'x 256, 264-65 (3d Cir. 2013) (quoting *Rodriguez*, 497 U.S. at 186); *see, e.g.*, *United States v. Paige*, 543 F. App'x 218, 221-22 (3d Cir. 2013); *United States v. Clark,* 96 F. App'x 816, 820 (3d Cir. 2004), *vacated on other grounds*, 125 S. Ct. 1017 (2005) ("The Supreme Court also has held that a warrantless entry is valid when based on the consent of a third party whom the police, at the time of the entry, *reasonably believed* possessed common authority over the premises.") (citing *Rodriguez,* 497 U.S. at 186). "Determination of the reasonableness of the law enforcement officer's belief is 'judged against an objective standard'"

which asks whether "'the facts available to the officer at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *Clark*, 96 F. App'x at 820 (quoting *Rodriquez*, 497 U.S. at 188-89); *see Walker*, 529 F. App'x at 265 ("'Whether the facts presented at the time of the search would warrant a man of reasonable caution to believe the third party has common authority over the property depends upon all of the surrounding circumstances.'") (quoting *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005)). Finally, "'[t]he government bears the burden of establishing the effectiveness of a third party's consent.'" *Id.* (quoting *Waller*, 426 F.3d at 845).

### 2. Analysis

At the suppression hearing, Agents Gaumond and Fritz testified that there was no internal division between what was later determined to be two lots. (14-cr-0050, Dkt. No. 33 at 28, 119). This was further confirmed by Lubrin himself, who acknowledged that Lots 10-A and 10-B appear to be one yard, with fruit trees growing on both and no visible boundary between the lots. (*Id.* at 170). Lubrin also conceded that the fences lining his and Mathurin's properties, which the agents observed, appear to be one continuous fence. (*Id.* at 169).

Moreover, according to Agent Gaumond, the area visible when entering Lubrin's property included one structure that was clearly a residence—Lubrin's yellow house—a shed, and another small structure. (*See id.* at 23-25).[11] When asked by the agents, "Who lives here?", Mathurin responded that he lived on the property with a friend, with his friend residing in the yellow structure and Mathurin in the small structure. (*Id.* at 29-30, 89, 109). Therefore, an officer

---

[11] The agents testified that there is no gate to Mathurin's property from the public road, while Lubrin's property has a wooden gate at the entrance. (14-cr-0050, Dkt. No. 33 at 12, 40).

could reasonably believe that the area was one shared property, with one large structure, a small structure, and a shed.[12]

Based on these circumstances, an officer of reasonable caution could believe that Mathurin had common use and access over the property, as well as common authority to consent to a search of what appeared to be one large, shared lot. *Stabile*, 633 F.3d at 230-31; *Walker*, 529 F. App'x at 265. Accordingly, the Court concludes that the agents did not violate Lubrin's Fourth Amendment rights when searching and seizing marijuana plants on the property as a result of Mathurin's consent to search.

## C.     Defendant Lubrin's Consent to Search

Finally, to the extent that Lubrin seeks to exclude marijuana plants obtained from within his home and tool shed, the Court finds that such evidence was legally collected as a result of Lubrin's voluntary consent.

### 1.     Applicable Law

An individual's consent to a search of his home is one of the clearly recognized exceptions to the Fourth Amendment's warrant and probable cause requirements. *Schneckloth,* 412 U.S. at 219. For consent to be effective, it must be voluntarily and freely given. *Price*, 558 F.3d at 278. "Fundamental to the concept of voluntariness is that valid consent must not be coerced." *United States v. Hynson,* 451 F. App'x 91, 94 (3d Cir. 2011). There is "no talismanic definition of voluntariness, mechanically applicable to the host of situations where the question

---

[12] The testimony revealed that when Agent Fritz asked Mathurin if he could open the yellow house, Mathurin proceeded to attempt to open the door without protest or any indication that he was not entitled to access. (14-cr-0050, Dkt. No. 33 at 120). That Mathurin did not have the key to Lubrin's yellow house does not detract from the reasonableness of the agents' belief that Mathurin had common authority over the property. The areas searched and the marijuana discovered as a result of Mathurin's consent were outdoors on the property, not inside the yellow house.

has arisen; instead, we determine the voluntariness of consent by examining the totality of the circumstances." *Price*, 558 F.3d at 278 (citing *Schneckloth*, 412 U.S. at 224). Factors to consider include "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; . . . the use of physical punishment; 'the setting in which the consent was obtained[;] and the parties' verbal and non-verbal actions." *Id.* (quoting *United States v. Givian*, 320 F.3d 452, 459 (3d Cir. 2003)).

### 2. Analysis

Agent Gaumond and Agent Fritz testified that they approached Lubrin from a vehicle as he stood on the side of the road, advised him of the marijuana found on his property, and told him that Mathurin had already been arrested. (14-cr-0050, Dkt. No. 33 at 38-39, 122-23). Following Lubrin's arrest, Agent Fritz advised Lubrin of his *Miranda* rights. (*Id.* at 123).[13] Agent Fritz testified that Lubrin stated that he understood his rights and wanted to cooperate. (*Id.* at 122-23). Lubrin stated that he had more marijuana plants in his home; granted consent to search his property; and signed a consent-to-search form. (*Id.* at 124-25). He then led the agents to his property; to the marijuana in his house; and to the marijuana in his shed. (*Id.* at 40-41, 124-25).

In granting his consent to search after receiving his *Miranda* warnings, Lubrin was not verbally or physically threatened by the agents. *See Price*, 558 F.3d at 280 (finding that consent was voluntarily given). There is no evidence of "signature signs of coercion," such as a "display of force," drawing of guns, or trying to "deceive or intimidate [Lubrin] into signing the consent form." *See United States v. Thach*, 411 F. App'x 485, 489 (3d Cir. 2011). Nor does the record indicate anything suggesting that Lubrin's "ability to understand the consequences of consent

---

[13] At the suppression hearing, Lubrin confirmed that an agent advised him of his rights after arresting him. (*See* 14-cr-0050, Dkt. No. 33 at 159).

was compromised by [his] background, education, or intelligence." *Id.* at 489-90. Accordingly, the Court finds that Lubrin's consent to search his home was voluntary, and will not suppress any evidence discovered as a result of his consent.

### III. CONCLUSION

For the reasons stated above, Defendant Lubrin's Motion to Suppress (Dkt. No. 8; 14-cr-0050, Dkt. No. 17) will be denied. An appropriate Order accompanies this Memorandum Opinion.

Date:  January 28, 2015                                   _____/s/_____
                                                          WILMA A. LEWIS
                                                          Chief Judge